**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 04-1342**

———————

L. J. PETTYJOHN,

Plaintiff - Appellant,

versus

ESTES EXPRESS LINES,

Defendant - Appellee.

———————

Appeal from the United States District Court for the Middle District of North Carolina, at Durham.  Russell A. Eliason, Magistrate Judge.  (CA-02-476-1)

———————

Argued:  November 30, 2004            Decided:  March 2, 2005

———————

Before TRAXLER, GREGORY, and DUNCAN, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Romallus Olga Murphy, Sr., Greensboro, North Carolina, for Appellant.  David Lee Terry, POYNER & SPRUILL, L.L.P., Charlotte, North Carolina, for Appellee.  **ON BRIEF:** Parmele Price Calame, POYNER & SPRUILL, L.L.P., Charlotte, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

This case concerns the termination of L. J. Pettyjohn's ("Pettyjohn") employment with Estes Express Lines ("defendant" or "Estes"), a trucking firm. Pettyjohn originally filed suit against defendant claiming that defendant's actions constituted unlawful discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and discrimination in violation of 42 U.S.C. § 1981 ("discrimination suit"). Additionally, Pettyjohn contended that the resignation provision included in his workers' compensation mediation agreement is barred by North Carolina's workers' compensation rules, and that defendant's attempt to secure his resignation was against public policy and without consideration. The district court granted defendant's motion for summary judgment, finding that Pettyjohn's claims were without merit. We affirm the district court.

I.

Estes employed Pettyjohn for eight years, during which time he was assigned to several different positions and his job performance was generally satisfactory. At the time of his injury, Pettyjohn was working as a Pickup and Delivery ("P&D") driver. P&D drivers drive local routes to pick up and deliver freight at various commercial locations. Pettyjohn's job required that he be able to lift a minimum of 100 pounds and that he be able to sit for 30-40

minutes at a time while driving. These requirements were apparently not a problem before Pettyjohn slipped and fell on ice while on a loading dock, thereby injuring his head and back. Subsequently, he found that he could not sit, drive, or lift as needed in his P&D driver position. Pettyjohn's physician initially imposed a restriction of no lifting, which remained in effect for four months. After that period, his physician allowed him to occasionally lift up to 55 pounds with no repetitive squatting, crouching, or kneeling. During his mandated physical restrictions, Pettyjohn was assigned to light duty work as a guard.

Approximately ten months after his injury, Pettyjohn's lifting restrictions were eased again, allowing him to lift up to 75 pounds. Subsequently, Estes had Pettyjohn alternate between the guard position and a somewhat better paying maintenance job. Eventually Pettyjohn was transferred to the higher paying maintenance job full-time. However, that position still did not pay as much as his previous P&D position.[1]

Over a year after his injury, Pettyjohn and his attorney, Ken Johnson ("Johnson"), attended a mediation session in an attempt to settle his workers' compensation claim. At that mediation, Pettyjohn signed, on the advice of his attorney, a document

---

[1] Pettyjohn's salary as a P&D driver was $17.35 an hour. During this period and throughout the remainder of his employment with Estes, Pettyjohn received compensation for his medical bills, his medical treatment, his lost wages, and his wage differentials.

entitled "Memorandum of Agreement of Mediation Conference" (the "Mediation Agreement"). This document stated that the matter had been settled by consent, that defendant's attorney was to draft an agreement, and that:

> The terms of this Agreement are as follows: $45,500 in a lump sum in IC #016453, payment of the entire med fee and waiver of lien in N.C. Claim DA 7/18/99 and D's will advance $5,000 on execution of clincher on both claims + resignation by employee-plaintiff.

J.A. 175. There is no dispute that Pettyjohn read and voluntarily signed the agreement with an attorney representing him. Pettyjohn's attorney informed his client that he had a certain number of days to revoke the Mediation Agreement.

Later that same day, Pettyjohn called the guard tower and told the supervisor on duty that "it was over," to which the supervisor initially responded that he should "come on in to work." However, once the supervisor was informed of the terms of the settlement, by Estes's HR representative, he called Pettyjohn back and said there was no longer any need for him to come back. Id. at 47. Pettyjohn agreed and said "okay." Id. at 48. Pettyjohn never returned to work for defendant.

Six weeks after the execution of the Mediation Agreement, the attorney representing Pettyjohn in his discrimination suit against Estes, R. Murphy ("Murphy"), contacted Johnson in an attempt to change the language in the workers' compensation "Agreement for Final Compromised Settlement and Release," also known as the

4

"Clincher Agreement," which was to be filed with the North Carolina Industrial Commission ("N.C.I.C."). Murphy sought to have the language concerning Pettyjohn's resignation struck from that document. According to both parties' counsel the Clincher Agreement that was actually submitted to the N.C.I.C. did not include the language regarding Pettyjohn's resignation.

Subsequently, defendant filed a motion for summary judgment in Pettyjohn's discrimination suit. In response and for the first time, Pettyjohn alleged: (1) that defendant's attempt to secure the resignation was against public policy; (2) his resignation was secured without consideration; and (3) that the resignation provision in his workers' compensation agreement violated North Carolina's workers' compensation rules. The district court found that Pettyjohn failed to make a prima facie case of race discrimination under Title VII or § 1981 and that Pettyjohn's new claims alleged in his response were not properly raised, however, the district court found that these claims warranted dismissal on the merits because they were unsupported by the evidence. Thus, the district court granted defendants' motion for summary judgment. Pettyjohn timely filed this appeal.

II.

We review a district court's summary judgment ruling de novo, viewing the evidence in the light most favorable to the non-moving

party.  Goldstein v. The Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 340 (4th Cir. 2000); Binakonsky v. Ford Motor Co., 133 F.3d 281, 284-85 (4th Cir. 1998). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

III.

Pettyjohn only appeals the district court's dismissal of his claim that securing a resignation in connection with a workers' compensation settlement violated of North Carolina's public policy, that his resignation was without consideration, and that his mediation agreement violates North Carolina's workers' compensation rules.[2]  We will address these issues in turn.  The district court noted that these claims were not properly raised.  Nevertheless, the district court reviewed and dismissed these claims on the merits.

The Federal Rules "allow liberal amendment of pleadings throughout the progress of a case." Elmore v. Corcoran, 913 F.2d 170, 172 (4th Cir. 1990) (citing Brandon v. Holt, 469 U.S. 464, 471

---

[2]Pettyjohn does not appeal the district court's dismissal of his race discrimination claims under Title VII and § 1981.

6

(1985) (holding that petitioner is allowed to amend pleadings before Supreme Court)). A party's failure to amend will not affect a final judgment if the issues resolved were "tried by express or implied consent of the parties." Elmore, 913 F.2d at 172 (quoting Fed. R. Civ. P. 15(b)). Even without a formal amendment, "a district court may amend the pleadings merely by entering findings on the unpleaded issues." Id. (quoting Galindo v. Stoody Co., 793 F.2d 1502, 1513 n.8 (9th Cir. 1986)).

In this case, there is no indication that defendant expressly or impliedly consented to try this issue, except for the fact that they did not explicitly object. Nevertheless, the district court did enter a finding on the unpleaded issue. While the record would have been clearer had Pettyjohn formally filed a motion to amend and the district court had formally entered an order granting that motion, they essentially did so in substance, if not in form. Thus, we find that Pettyjohn's appealed claims are properly before us. See People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 367 (4th Cir. 2001) (finding that plaintiff's summary judgment briefs essentially moved the district court for leave to amend its complaint and court appears to have granted that motion via its summary judgment ruling).

First Pettyjohn argues in his appeal, that the "requirement to resign as a part of a Workers' Compensation 'Clincher Agreement' is in violation of North Carolina's Public Policy." Appellant's Br.

7

at 2.  North Carolina adheres to the at-will employment doctrine which states that "in the absence of a contractual agreement . . . establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party."  Tarrant v. Freeway Foods of Greensboro, 593 S.E.2d 808, 811 (N.C. Ct. App. 2004).  However, the Supreme Court of North Carolina held that an employer can not terminate an employee for pursuing her workers' compensation rights.  Id.  The court held in Tarrant that:

> While there is not a specific list of what actions constitute a violation of public policy, the exception has applied where the employee is fired (1) for refusing to violate the law at the employer[']s request, (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy.
>
> This Court has considered whether a claim of wrongful discharge based upon North Carolina public policy of not punishing employees for exercising their statutory rights under the Workers' Compensation Act was tenable[.] . . . we concluded that such a cause of action probably does exist . . . . The next time this Court considered the issue we stated unequivocally [that a] plaintiff may state a claim for wrongful discharge in violation of public policy where he or she alleges the dismissal resulted from an assertion of rights under the Workers' Compensation Act.

593 S.E.2d at 811 (internal citations omitted) (emphasis added).

In Tarrant, six years after the plaintiff filed a workers' compensation claim, the employer rehired her.  Id. at 809-10.  Two days later, she was fired.  Id. at 810.  The plaintiff provided evidence that she was fired because she filed a workers'

8

compensation claim. For example, when she was leaving the store after being rehired, she claimed that the district manager asked her, "Are you going to behave? You're not going to fall again, are you?". Id. at 812. Also, on the day she was terminated, a manager told her that her job performance was fine, but the company did not want her around because she cost them a lot of money. Id. Although there was no close temporal connection between the filing of the claim and the alleged retaliatory act, the employer essentially admitted that it terminated the plaintiff for pursuing her workers' compensation rights. Id.

Based on the court's reasoning in Tarrant and the facts in this case, Pettyjohn must show that he was either: (1) "fired" or constructively discharged because he filed a workers' compensation claim; or (2) forced to resign to settle his workers' compensation claim -- to support his assertion that Estes actions violated North Carolina's public policy. See Salter v. E & J Healthcare, Inc., 575 S.E.2d 46, 51 (N.C. Ct. App. 2003) (finding that the employee has the burden of pleading and proving that the employee's dismissal occurred for a reason that violates public policy and that there was a causal connection between the activity and the dismissal).[3] In the case at bar, there is no causal or temporal

_____

[3] To establish a prima facie case of retaliation, it must be shown that (1) the plaintiff engaged in a protected activity, (2) the employer took adverse action, and (3) there existed a causal connection between the protected activity and the adverse action." Id. at 51.

9

connection between Pettyjohn's protected activity of filing his workers' compensation claim and his alleged forced resignation, i.e. constructive discharge.[4] In fact, Pettyjohn testified in his deposition that his termination was solely because of his race.

Further, the topic of resignation did not surface until after the parties entered into a mediation to settle Pettyjohn's workers' compensation claim. Johnson said that the mediation was an arms-length negotiation, in the presence of a mediator and attorney's representing both parties. Johnson also testified that defendant initially offered to settle Pettyjohn's workers' compensation claim for $7,500. The negotiations elevated the amount to approximately $30,000, at which point the issue of a general release was raised -- including Pettyjohn's discrimination claims or his resignation. Johnson testified that he informed Pettyjohn that "resignation[s] in clincher agreements in the trucking industry especially [are] standard." J.A. 225. When asked if "resignation of employment was part of what you all [Pettyjohn and Johnson] settled for at the mediation?" Id. at 227. Johnson answered, "Yes." Id. Thus, Pettyjohn offers no evidence that at the time of the mediation defendant "required" him to resign to settle his workers' compensation claim or was unwilling to settle his claim unless he

_____

[4]For the sake of argument we will treat Pettyjohn's assertion that he was forced to resign as a claim of constructive discharge.

10

resigned. Therefore, plaintiff fails to show that he was constructively or otherwise discharged or that his voluntary resignation was a wrongful discharge against North Carolina's public policy. <u>Gravitte v. Mitsubishi Semiconductor Am.</u>, Inc., 428 S.E.2d 254, 258 ("To proceed under [the public policy] exception, plaintiff must allege facts which indicate that she was in fact 'discharged.' If plaintiff voluntarily resigned defendant's employ, she cannot bring a claim for wrongful discharge.").

Pettyjohn's second claim, that he was not compensated for his resignation, fails because he was actually compensated for his resignation. The Mediation Agreement calls for Pettyjohn's resignation and settlement of his workers' compensation claim in exchange for $45,500. Estes accepted Pettyjohn's resignation, proceeded to execute the Clincher Agreement, and did in fact pay Pettyjohn $45,500. Moreover, neither Pettyjohn nor anyone acting on his behalf ever revoked the Mediation Agreement which included payment for his resignation. Therefore, Pettyjohn's claim that his resignation was without compensation is without merit.

Pettyjohn's third claim, that the exclusion of the resignation language in the Clincher Agreement violates N.C.I.C. Rule 502, fails because Rule 502 does not prohibit resignations as part of workers' compensation settlements. North Carolina Industrial Commission Rule 502 provides in relevant part:

11

Compromise settlement agreements.
(a) All compromise settlement agreements must be submitted to the Industrial Commission for approval. Only those agreements deemed fair and just and in the best interest of all parties will be approved.
(b) No compromise agreement will be approved unless it contains the following language or its equivalent:

. . . .

(3) That the employee knowingly and intentionally waives the right to further benefits under the Workers' Compensation Act for the injury which is the subject of this agreement.

. . . .

(5) That no rights other than those arising under the provisions of the Workers' Compensation Act are compromised or released.

4 N.C.A.C. 10A.0502 (emphasis added).

Rule 502 refers to the narrow jurisdiction of the Industrial Commission, prohibiting parties from including issues not relevant to an employee's workers' compensation claim. Pettyjohn does not offer the court any evidence or case law to support the assertion that defendant acted contrary to North Carolina's workers' compensation rules. Pettyjohn does not substantiate his implied claim that resigning was a "right" he was releasing or compromising, thus prohibited from being included in the Clincher Agreement. The language of the rule only prohibits the releasing of rights. That does not prohibit the employee or the employer from using the employees' position as a bargaining chip or leverage

12

during settlement negotiations.[5] Although the parties chose to omit the resignation language in the document submitted to the N.C.I.C, that does not violate North Carolina's workers' compensation rules.[6]

IV.

In sum, Pettyjohn has not demonstrated that defendant constructively discharged or fired him because he filed a workers' compensation claim, that defendant required him to resign in order to settle his workers' compensation claim, in violation of North Carolina's public policy, that he was not compensated for his resignation, or that defendant violated North Carolina's workers' compensation rules. Based on the foregoing, we affirm the district court.

AFFIRMED

---

[5] It would, however, prohibit the employer or employee from compromising or releasing an employees' EEOC claims, for example. As we noted supra, Pettyjohn's attorney, Johnson, testified and plaintiff does not dispute that it was standard for resignations to be included in Clincher Agreements in the trucking industry.

[6] The record does not demonstrate that either of the parties believed that Pettyjohn's resignation was no longer in effect due to the deletion of the resignation language from the document submitted to the N.C.I.C. Thus, the omission neither revoked nor rescinded Pettyjohn's resignation, which occurred immediately upon the signing of the Mediation Agreement.